**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **KHADIJA REGENE COMEGAR, *ET AL.*** | : | **CIVIL ACTION** |
| *Plaintiffs,* | : | |
| **v.** | : | **No. 20-cv-5328** |
| **CITY OF CHESTER, ET AL.** | : | |
| *Defendants.* | : | |

## <u>MEMORANDUM OPINION</u>

Goldberg, J.                                                          **October 26, 2022**

This case arises from an electrical house fire that killed decedents James Comeger and Ralph Freeman, Sr., on April 7, 2019.  Plaintiffs Khadijah Regene Comeger and Ralph Freeman, Jr. have filed suit on behalf of the decedents' estates against the City of Chester (the "City") and property management company Shamar Management, LLC.[1]  Plaintiffs allege that the City violated the decedents' constitutional rights when it failed to adequately address safety issues at decedents' home.  Plaintiffs seek recovery for violations of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 under a state-created danger theory and <u>Monell</u> liability.[2]

---

[1]     Plaintiffs have also filed a separate lawsuit against Peco Energy Company in connection with this incident (<u>Khadija Regene Comegar, et al. v. PECO</u>, Civil Docket No. 2:20-cv-5388), and a third case on behalf of a different decedent has also been filed against all defendants (<u>Freeman v. City of Chester et al.</u>, Civil Docket No. 2:21-cv-01554).

[2]     Plaintiffs additionally assert a survival action and wrongful death claims against the City.  Plaintiffs asserted these state law claims against the City in their original complaint but abandoned the claims when they filed their first and second amended complaints (*compare* ECF No. 1 *with* ECF Nos. 21, 33). Additionally, Plaintiffs do not address the survival action or their wrongful death claims in their brief in opposition to the motion to dismiss.  Therefore, I will construe these claims as incorporating their § 1983 claims rather than as separate causes of action for negligence under state law.

Previously, on November 30, 2021, I granted the City's motion to dismiss Plaintiffs' first amended complaint without prejudice, finding that Plaintiffs had not adequately pled a claim against the City because the amended complaint failed to allege a policy or policymaker under Monell. Without addressing the merits of their state-created danger claim, I provided Plaintiffs with the opportunity to amend their complaint, which they did on December 29, 2021, through the filing of a Second Amended Complaint.

Pending before me is the City's motion to dismiss Plaintiffs' Second Amended Complaint. For the following reasons, the City's motion will be granted.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[3]

The following facts are taken from the Second Amended Complaint:

- In 2007, twelve years before the fire in question, Chester's Licensing & Inspection Department issued a safety inspection report of a property located at the corner of Concord Avenue and 3rd Street in Chester, Pennsylvania (Second Am. Compl. at ¶ 12, ECF No. 33.) After conducting the safety inspection, the City failed the property for all twenty-six items on the inspection checklist, including fire extinguishers, smoke detectors, fire alarms, a sprinkler system, and exposed wires. (Id. at ¶ 12.) Notwithstanding the failed inspection, the City issued a certificate of occupancy for the property to a former owner, Valerie Sanbe. (Id. at ¶ 13.)

- At some unspecified time, Shamar Management bought the property from Ms. Sanbe. At some point after Shamar Management bought the property, decedents began renting and residing at the property. The City was aware, since December of 2017, that Shamar was renting out the property despite it not being "up to code." (Id. at ¶ 17.) The City also continued to charge and receive payment for property taxes on the property. (Id. at ¶ 16.)

- On December 26, 2017, Assistant Housing Inspector for the City, Ebone Butler, sent a notice to Shamar explaining that Shamar was in violation of a local ordinance because a certificate of occupancy was never issued for the property prior to renting.[4]  Ms.

---

[3]     In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief. Atiyeh v. Nat'l Fire Ins. Co. of Hartford, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010).

[4]     It is unclear, on the face of the Second Amended Complaint, why city officials would have reached out and stated that a certificate of occupancy had never been issued for the property, yet Plaintiffs allege

Butler copied the City's Director of Public Safety, William Al Jacobs, and the City's Code Official, Keith Fugate, on this correspondence.  (Id. at ¶ 18.)

- Upon receiving no response, Ms. Butler sent a follow-up notice to Shamar about the need for a certificate of occupancy on February 12, 2018, again copying Mr. Jacobs and Mr. Fugate.  Ms. Butler indicated in this follow-up notice that Shamar must "call our office and setup (sic) an appointment for an inspection," or a "Magistrate Complaint" would be filed.  (Id. at ¶ 19.)

- Ms. Butler sent a "Final Notice" to Shamar on April 5, 2018, again copying the same persons and threatening that a Magistrate Complaint would be filed if Shamar did not call their office to set up an appointment for an inspection.  (Id. at ¶ 20.)

- Although Shamar ignored these notices and failed to obtain a new certificate, the City continued to allow residents, including the decedents, to reside at the property.  (Id. at ¶ 21.)  There were a variety of hazardous conditions at the property, including "multiple appliances and electronics plugged into a power strip connected to a neighbor's power outlet, an overcrowded circuit breaker, a faint gasoline smell, lawn maintenance machines stored on the first floor of [the] property, and a sewer backup in the basement."  (Id. at ¶ 25.)

- On April 7, 2019, an electrical fire occurred at the property, killing the decedents.  (Id. at ¶ 32-37.)

## II.  LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. While it "does not impose a probability requirement at the pleading stage,"

---

that a certificate was in fact issued in 2007 after the failed safety inspection.  However, the City attached the certificate of occupancy to its motion to dismiss and clarified that the certificate was labeled as "for purposes of sale only."  (Def.'s Mot., Ex. B).  The certificate also stated "[t]he new owners have to apply for a permanent certificate of occupancy in their name."  (Id.)  Because the certificate of occupancy's authenticity is not disputed, I will consider this document as related to plaintiff's claims.  Levins v. Healthcare Revenue Recovery Grp. LLC, 902 F.3d 274, 279 (3d Cir. 2018) (courts may consider an authentic document that a defendant attaches to a motion to dismiss when plaintiff's claims are based on that document).

plausibility does require "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a claim." Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

To determine the sufficiency of a complaint under Twombly and Iqbal, the Court must take the following three steps: (1) the Court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the Court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).  In evaluating a motion to dismiss, courts generally consider only the allegations contained in the complaint, the exhibits attached thereto, and matters of public record. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 567 (3d Cir. 2002).  Finally, "a complaint may not be dismissed merely because it appears unlikely that [a] plaintiff can prove those facts or will ultimately prevail on the merits." Connelly v. Lane Constr. Corp., 809 F.3d 780, 790–91 (3d Cir. 2016) (quoting Phillips, 515 F.3d at 231).

## III.   ANALYSIS

When analyzing a § 1983 claim against a municipality, the Third Circuit directs courts to engage in a two-step analysis, determining: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) whether the municipality is responsible for that violation.  Nawuoh v. Venice Ashby Cmty. Ctr., 802 F. Supp. 2d 633, 644–45 (E.D. Pa. 2011) (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1149–50 (3d Cir.1995)).  Accordingly, courts typically analyze these claims by first addressing: (1) whether the plaintiff has sufficiently pled a constitutional

4

violation (in this case, via a state-created danger claim), and then, because that "by itself is not enough to implicate municipal liability," (2) whether a municipal policy or custom was the proximate cause of the constitutional violation.  <u>M.B. ex rel. T.B. v. City of Philadelphia</u>, No. 00-cv-5223, 2003 WL 733879, *6 (E.D. Pa. Mar. 3, 2003).

I will first address the merits of Plaintiffs' state-created danger claim, and then address the municipal liability issue.

**A.     State-Created Danger Claim**

The Due Process Clause of the Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This prohibition, however, does not "require[ ] the State to protect the life, liberty, and property of its citizens against invasion by private actors." <u>Deshaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).  Therefore, "[a]s a general matter, ... a State's failure to protect an individual against private violence ... does not constitute a violation of the Due Process Clause." <u>Id.</u> at 197, 109 S.Ct. at 998.

State officials may however be liable for some violent acts by private parties if the state itself exposed the injured person to danger.  Under the "state-created danger" doctrine, a state actor violates the Due Process Clause when the following elements are met:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) [the] state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

<u>Bright v. Westmoreland Cty.</u>, 443 F.3d 276, 281 (3d Cir. 2006) (quotation marks omitted).

The City argues that Plaintiffs fail under all four elements of this test, but primarily focuses on the fourth element – the requirement of an affirmative act.  The City contends that Plaintiffs' allegations only amount to a <u>failure to act</u>, that is, Plaintiffs' claims only allege the City failed to protect decedents and should have either required the property to be repaired or evicted decedents before the fire occurred.  The City stresses that a state-created danger claim requires an affirmative act the City took that made the decedents more vulnerable to injury.  Plaintiffs respond that all four elements of a state-created danger claim are met and that the affirmative act occurred when the City issued a certificate of occupancy for the property despite it failing a safety inspection, and then allowed decedents to continue to reside at the property despite knowledge of the failed inspection.

### 1.  Foreseeability and Fairly Direct Consequence of Defendant's Actions

The first element of a state-created danger claim requires the harm caused to be foreseeable and a fairly direct consequence of the defendant's actions.  The Third Circuit addressed this element in <u>Henry v. City of Erie</u>, which is factually analogous to this case.  728 F.3d 275 (3d Cir. 2013).  In <u>Henry</u>, tenant participants in a Section 8 housing program were killed in an apartment fire.  <u>Id.</u> at 277.  The third-floor apartment did not have the proper smoke detectors or fire escape ladders to pass a safety inspection.  <u>Id.</u> at 278–79.  Despite this, a housing inspector allowed the apartment to pass inspection and continued to do so for several years despite the safety concerns not being addressed.  <u>Id.</u>  Section 8 program coordinators contacted the tenants on multiple occasions threatening to terminate their housing assistance payments until the apartment passed a new inspection.  <u>Id.</u>  Four years passed between the first "passed" inspection and the fire.  <u>Id.</u>  The decedents' estates brought a state-created danger claim against the city, arguing that if the city had

not approved and subsidized the apartment, decedents would not have lived there, and they would not have died in the fire.  Id.

In analyzing whether the harm caused was foreseeable and a "fairly direct" result of defendant's actions, the Third Circuit first found that the harm was foreseeable because the risk of living in a third-floor apartment with no smoke detectors or fire escapes was clear.  Id. at 283. However, with respect to the "fairly direct" issue, the court noted that "state actors are not liable every time their actions set into motion a chain of events that result in harm."  Id.  Rather, a plaintiff must allege the defendant's actions were "the catalyst for the harm."  Id. at 285.  The court concluded that the defendant's approval and subsidization of the apartment did not lead directly to the fire that killed the decedents because "[d]efendants' actions were separated from the ultimate harm by a lengthy period of time and intervening forces and actions."  Id.

Here, like Henry, the fire was not a "fairly direct" result of the City's actions because there is no allegation that the City itself caused the fire or increased the property's susceptibility to fire.[5] Rather, the City issued a certificate of occupancy for the property despite the property not passing a safety inspection, and an electrical fire occurred a full twelve years later.  The City's affirmative act, therefore, was separated from the ultimate harm by both time and intervening events.  In fact, the length of time between the City's actions and the ultimate harm is even greater here than it was in Henry, where the Third Circuit found just four years to be sufficient.  Therefore, Plaintiffs have not satisfied the first element of their state-created danger claim.  Notwithstanding this conclusion, I will also address the remaining elements.

---

[5]     Plaintiffs allege that "a fire erupted inside the property due to the actions/inactions of Defendants[.]"  (Second Am. Compl. ¶ 32.)  However, as explained in Section III.A.3. infra, the City took no affirmative act for purposes of a state-created danger claim and, thus, I will not consider this conclusory allegation.

### 2.   Conscience-Shocking Conduct

Plaintiffs have failed to meet the second element of a state-created danger claim as well – conscience shocking conduct.  The degree of culpability sufficient to shock the conscience is context-specific and varies case by case, but courts have generally found that "deliberate indifference – *i.e.* a conscious disregard of a substantial risk of serious harm – will suffice."  Ray v. Cain, 724 Fed. Appx. 115, 118 (3d Cir. 2018).  Here, the City issued a certificate of occupancy for the property despite it failing a safety inspection.  Then, after the property was sold to co-defendant Shamar Management, the City sent Shamar notices on three separate occasions indicating that the property was in violation for not having a current certificate and threatening enforcement action.  Even construing the facts in the light most favorable to Plaintiffs, the City's conduct cannot be fairly characterized as "deliberate indifference" when it made multiple attempts to remedy the issue.  In fact, the City actively discouraged co-defendant Shamar from renting the property and demanded that they set up an appointment for an inspection or risk being reported. At most, the City's failure to take enforcement action sooner could potentially be characterized as negligent, which is insufficient to shock the conscience.  Id. at 118 (finding allegations of deliberate indifference insufficient where defendant's alleged actions were accompanied by efforts to mitigate the risks to plaintiff).  Thus, Plaintiffs also have not satisfied the second element of their state-created danger claim.

### 3.   Affirmative Act[6]

The City presses that allegations of inaction are insufficient to meet the fourth element of a state-created danger claim.  It cites several applicable cases to support this contention.  See

---

[6]     It is unnecessary for me to address the third element – whether the plaintiff was a foreseeable victim of the defendant's acts – because as explained below, I find the City did not take an affirmative act for purposes of a state-created danger claim.

Deshaney, 109 S. Ct. at 998 (state had no constitutional duty to protect child who was beaten to death by his father despite social services being repeatedly advised of child abuse suspicions); Morse v. Lower Merion School Dist., 132 F.3d 902, 906-07 (3d Cir. 1997) (no liability for school district where mentally ill woman accessed school building through unlocked back door and shot and killed a teacher because attack was not a foreseeable result of leaving door unlocked); D.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1376 (3d Cir. 1992) (no constitutional violation where students were repeatedly raped during class and school district took no action to stop it despite school administrators being advised of incidents of misconduct); Bright, 443 F.3d at 285 (no constitutional violation where child molester parolee murdered his victim's sister despite state actors being aware that he had continually violated his parole by contacting the victim and the parole board waited ten weeks to schedule a revocation hearing); Morrow v. Balaski, 719 F.3d 160, 178 (3d Cir. 2013) (no affirmative act where school district permitted student to return to school rather than expelling her after she was temporarily suspended for attacking another student and later attacked the student again).

I find Morrow particularly instructive here.  In Morrow, the plaintiff students were subjected to repeated threats and attacks from another student.  Id. at 164.  The school district suspended the attacker student, but when she returned to school, she attacked the plaintiffs again, with one incident occurring after the attacker student was permitted to board the plaintiffs' school bus despite the school being aware of the prior incidents.  Id.  The plaintiffs argued that the school district's affirmative act was suspending the attacker student, and then implicitly allowing her to return to school rather than expelling her.  Id. at 177.  Plaintiffs contended this affirmative use of authority by the school district created a danger that the student attacker would harm them again. Id.

9

The <u>Morrow</u> court discussed the often-blurred line between action and inaction in the context of determining liability for the acts of third-party tortfeasors. In doing so, the court found that the plaintiffs were "simply attempt[ing] to redefine clearly passive inaction as affirmative acts." <u>Id.</u> at 178. After first finding that the affirmative act of suspending the attacker student actually protected the plaintiffs from harm rather than rendering them more vulnerable to it, the court noted that: "the fact that [the school district] failed to expel [the student attacker], or, as [plaintiffs] would describe it, 'permitted' [the student attacker] to return to school after the suspension ended, does not suggest an affirmative act." <u>Id.</u> The court cautioned that finding otherwise would cause the state-created danger exception to swallow the rule, because "[s]chools would always be liable . . . for any injury that could be linked to either action or inaction." <u>Id.</u> Similarly, the court rejected the argument that the school district took an affirmative act when it permitted the student attacker to board the plaintiffs' bus because "the only reasonable interpretation of that allegation is that the [school district] failed to take any affirmative steps to ensure that [the student attacker] did not board [plaintiffs'] bus." <u>Id.</u> The court concluded that this attempt to "morph passive inaction into affirmative acts" was insufficient to survive a motion to dismiss the state-created danger claim. <u>Id.</u>

Here, Plaintiffs' allegations against the City are also an attempt to "morph passive inaction into affirmative acts." Plaintiffs allege that the City's affirmative act was issuing a certificate of occupancy for the property after it had failed an inspection and then allowing decedents to remain living at the property despite the safety concerns. But this is similar to the allegation in <u>Morrow</u> where the school district's affirmative act was suspending the attacker student and then permitting her to return to school. In both scenarios, the affirmative act is far attenuated from the alleged harm, and the true cause for complaint is the municipality's failure to act after the fact.

The certificate of occupancy at issue here was meant to be temporary, as it indicated that it was issued "for purposes of sale only" and that the subsequent owners would be required to apply for a permanent certificate in their own name. Like the suspension in Morrow, the certificate was a temporary solution for what would prove to be a more permanent problem. And in both cases, the plaintiffs attempted to attach liability to the municipality for their failure to step in later and correct the issue: in Morrow by not expelling the student attacker, and here, by not evicting the decedents before the fire occurred. But municipalities cannot be held liable for inaction. Thus, Plaintiffs have not satisfied the fourth element of their state-created danger claim.

### B. Monell Liability

It is well settled that municipal liability under § 1983 "may not be proven under the *respondeat superior* doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." Benhaim v. Borough of Highland Park, 79 F.Supp.3d 513, 521 (D.N.J. 2015) (quoting Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)). Therefore, to state a claim under Monell, a plaintiff must establish that: (1) the municipality had a policy or custom that deprived the plaintiff of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 98 S. Ct. 2018; Buoniconti v. City of Philadelphia, 148 F. Supp. 3d 425, 435–36 (E.D. Pa. 2015). "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation,

policy or edict.'" <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299 (1986)).

First, because I have found there is no constitutional violation, there can be no derivative municipal claim against the City. <u>H.U. v. Northampton Area Sch. Dist.</u>, No. 20-2996, 2021 WL 4810170, at *3 (3d Cir. Oct. 15, 2021). However, even assuming Plaintiffs could make out an underlying violation, their claim would still fail because there is no basis for municipal liability here. Plaintiffs allege that the City had a "de facto policy" of, among other things, "issuing Certificate of Occupancies to properties within Chester with failed inspections." (Second Am. Compl. ¶¶ 76-87). However, Plaintiffs do not cite any facts to suggest that the City has issued any certificates to properties with failed inspections other than the one at issue here. If Plaintiffs seek to allege that this practice was so widespread as to constitute a "policy," they must cite examples other than the allegations that form the basis of the complaint itself. <u>Kane v. Chester Cnty. Dep't of Child., Youth & Fams.</u>, 10 F. Supp. 3d 671, 688 (E.D. Pa. 2014) (dismissing <u>Monell</u> claim because "the Second Amended Complaint has not alleged any practices that are persistent and widespread beyond this one particular case.") Despite providing Plaintiffs with the opportunity to amend their complaint a second time, these allegations are insufficient.

For the foregoing reasons, Plaintiffs have failed to sufficiently plead a state-created danger claim or a basis for municipal liability. As leave to file a third amended complaint would be both futile and inequitable, I will dismiss Plaintiffs' claims with prejudice.

An appropriate order follows.